SELMA RIDENOUR, by Guardian, Respondent, v. WILCOX MINES COMPANY, Appellant.

Springfield Court of Appeals, May 6, 1912.    Motion for Rehearing Overruled June 3, 1912.

1. **MINES AND MINING: Master and Servant: Safe Place to Work: Protection from Falling Rock: Negligence: Sufficiency of Evidence.** In an action against a mining company on account of the alleged negligent killing of a servant, who while working as a tub hooker at the bottom of shaft was struck by a heavy boulder which fell from an ore can as the same was being hoisted to the top, the evidence on the part of plaintiff tending to show that the injury could have been avoided by a continuance of the shaft through the open space, so that the ascending cans would be guided thereby; that rocks from the cans would be less liable to fall or would fall straight down through the shaft and not upon any one standing away from the shaft. There was also evidence that a snow shed might have been built at the bottom of the shaft to protect the deceased from falling rock. Defendant's evidence tended to show that it would not have been practical to continue the shaft to the bottom or to have built the snow shed on account of blasting in the mine. *Held*, that the evidence was sufficient to show a

causal connection between the acts of negligence complained of and the injury to the deceased and that the judgment for plaintiff should be sustained.

2. ————: Pleading: Negligence: Protection from Falling Rock: Sufficiency of Petition. In an action against a mining company on account of the death of plaintiff's decedent, who was struck by a rock falling from an ore can while he was working at the bottom of the shaft as tub hooker, the allegations in the petition relating to the negligent failure of the defendant to continue the shaft from the roof of the mine to the bottom and its failure to erect a snow shed so as to protect the deceased from falling rocks are examined and *held* sufficient allegations of negligence.

3. MASTER AND SERVANT: Negligence: Duty to Install Appliance to Prevent Accidents. In all occupations attended with great and unusual danger the master must use all appliances readily obtainable which are known for the prevention of accidents and the neglect to provide such readily obtainable appliances is proof of negligence.

4. EVIDENCE: Expert Testimony: Operating Machinery. The usual and ordinary way of constructing and operating machinery structures and appliances is a proper subject for expert evidence.

5. ————: Hypothetical Questions. The facts which a hypothetical question must cover should be governed largely by the subject-matter of each particular investigation and must be within the confines of the evidence and to a large extent is subject to the sound discretion of the trial judge.

6. ————: ————: Objections to Question: Appeal and Error. Objections to evidence to be available in the appellate court must be specific and the same rule applies in making objections to hypothetical questions put to an expert. The objection to such question should state why the question is not proper and what essentials are omitted.

7. ————: ————: ————: Identity of Conditions. In an action against a mining company on account of the alleged negligent killing of a servant while at work in a mine, an objection was made to a hypothetical question on the grounds that it did not show that the condition in the mines concerning which the expert was called upon to testify were the same conditions which existed in the defendant's mine. *Held*, that identity of conditions was not required in such cases and the hypothetical question propounded was proper.

164 App.—37

8. **WITNESSES: Impeachment: Specific Delinquencies: Cross-Examination.** Although ordinarily the credibility of a witness cannot be impeached by specific delinquencies, but only by general reputation, yet on cross-examination the witness's credibility may be affected by questions which tend to reflect on his accuracy, veracity and morality and tending to show his depravity.

9. **EVIDENCE: Book Entries: Party Furnishing Items Should Testify.** Where a clerk makes entries from items furnished by another, but has no knowledge of their correctness and where such entries are made by a bookkeeper from reports made by a foreman, it is *held* essential that in addition to the oath of a party making the entries the party furnishing the items should testify as to their correctness.

10. **APPEAL AND ERROR: Assignment of Errors: Briefing Point: Waiving Error.** Where the appellant included in its assignment of errors the giving of an instruction on behalf of respondent but makes no further reference thereto, either in its first brief or reply brief, but in its additional reply brief again raises the point and makes an argument thereon, it will be deemed to have waived the assignment of error and the appellate court will not consider the point.

Appeal from Jasper Circuit Court.—*Hon. David E. Blair,* Judge.

AFFIRMED.

*J. P. McCammon* and *Bates & Stewart* for appellant.

(1) In order to make out a case it is necessary to prove that the alleged acts of negligence caused the injury. Brown v. L. & L. Co., 65 Mo. App. 166; Herke v. Railroad, 141 Mo. App. 617; Warner v. Railroad, 178 Mo. 125; Goranson v. Mfg. Co., 186 Mo. 300; Trigg v. Land and Lumber Co., 187 Mo. 231; Klebe v. Distilling Co., 207 Mo. 480. (2) It is not enough to show that Ridenour's death might have resulted from the acts of negligence. The burden was on respondent to show with reasonable certainty that these acts were the cause of the injury. Stickman v. Bank, 126 Mo. App. 664; Hodges v. Railroad, 135 Mo. App. 683; Ly-

man v. Dale, 136 S. W. 165; Jewel v. Mfg. Co., 143 Mo.
App. 210; Warner v. Railroad, 178 Mo. 125. (3) It
was more reasonable to infer from the testimony that
the rock that killed Ridenour might have been caused
to fall out by his failure to start the can straight or
by pushing it out of line after it had already started
and when there is conjecture as to the cause the court
should take the case from the jury. Kelley v. Rail-
road, 141 Mo. App. 490; Harper v. Terminal Co., 187
Mo. 575. (4) It is competent evidence to show the
frequency of cans bumping under conditions shown by
appellant to be similar to those existing at the time
of the accident, not only before the accident occurred
but afterward. It is competent for the purpose of
showing the probability of accidents happening. Trigg
v. Land and Lumber Co., 187 Mo. 236. (5) The court
erred in allowing plaintiff to attack the credibility of
defendant's witness, B. F. Plumlee. The credibility
of a witness cannot be impeached by specific past
delinquencies but only by his general reputation in the
neighborhood where he resides. Specific acts of law-
lessness or moral turpitude are not admissible for that
purpose. State v. Phillips, 233 Mo. 305; Wright v.
Kansas City, 187 Mo. 693; State v. Gessel, 124 Mo. 533;
State v. Rogers, 108 Mo. 204.

*D. C. Mallory, Ray Bond, Frank Lee* and *R. M.
Sheppard* for respondent.

(1) On appeal the party in whose favor a ver-
dict has been rendered is entitled to the benefit of
every reasonable inference of fact which the evidence
warrants to support the verdict, and where the ver-
dict is for the plaintiff the evidence should be viewed
by the appellate court in its most favorable aspect in
support of the verdict. Arnold v. Cason, 95 Mo. App.
426; Cunliff v. Hansman, 97 Mo. App. 467. (2) In
determining whether there was any substantial evi-

dence to sustain the verdict for the plaintiff the appellate court should not consider defendant's controverting evidence but should assume that the plaintiff's evidence is true and give it every favorable inference which may be reasonably and fairly drawn from it. Holloway v. Kansas City, 184 Mo. 19; Lackland v. Mining Co., 110 Mo. App. 634; Phillips v. Railroad, 196 Mo. 321; Hurst v. Mining Co., 141 S. W. 471; Hollowell v. Telephone Co., 195 Mo. 165; Phelan v. Paving Co., 115 Mo. App. 423; Morgan v. Mining Co., 141 S. W. 740; Evana v. Railroad, 178 Mo. 508; Eckhard v. Telephone Co., 202 Mo. 345; McKenzie v. Railroad, 216 Mo. 115. (3) The court did not commit error in permitting the plaintiff, upon cross-examination of the witness Plumbley, to ask him certain questions relative to his conduct, and which affected his moral standing and veracity. It is the law of this state that a witness may be asked upon cross-examination such questions as will show his moral standing and for that purpose he may be asked upon cross-examination if he has been convicted of any criminal offenses, or any other question which would tend to impugn his character for morality, veracity, honesty and virtue. O'Conner v. Transit Co., 106 Mo. App. 219; Real v. People, 42 N. Y. 270; Miller v. Association, 5 Mo. App. 401; State v. Forshone, 190 Mo. 326; State v. Long, 201 Mo. 675. (4) The court committed no error in refusing to show the number of cans of ore that had been hoisted from its mine from the time of the accident in question to the date of the trial. The court permitted the defendant to go into that thoroughly, as to any accidents that occurred prior to the trial. It is well settled in this state that negligence cannot be inferred from injury or the accident itself, and that upon the trial of a case where negligence is alleged that evidence of other accidents or injuries occasioned by the same alleged negligence is not competent to establish negligence, the converse is likewise

true that the fact that dangerous machinery, appliance or condition has been permitted to exist for a long period of time and no accidents or injuries resulted therefrom would not prove that the master maintaining said machinery or instrumentalities in the condition they were in was not guilty of negligence. Chase v. Railroad, 156 Mo. App. 701; Smart v. Kansas City, 91 Mo. App. 594; Goble v. Kansas City, 148 Mo. 470; Edwards v. Paving Co., 92 Mo. App. 225; Kelley v. Parker-Washington Co., 107 Mo. App. 495; State v. Hodges, 144 Mo. 54; State v. Zorn, 202 Mo. 48; Van Cleave v. Railroad, 124 Mo. App. 232.

NIXON, P. J.—This action was brought by R. N. Alexander as guardian of Selma Ridenour, a girl three years of age, for the alleged negligent killing of her father in the defendant's mine. Judgment was rendered in the trial court for the sum of two thousand dollars against the defendant from which it has appealed.

The allegations of negligence in plaintiff's petition upon which recovery was sought are as follows:

"That defendant, wholly disregarding its duty to said Jesse W. Ridenour in that respect, negligently and carelessly permitted the place where said Jesse W. Ridenour worked to become, be and remain in a dangerous and unsafe condition in this, to-wit, that the roof of the underground room or drift in which said Jesse W. Ridenour worked was very high and that said roof at the place where said shaft entered into said room or drift was between seventy-five and one hundred feet above the floor of said room or drift; that the place where said Jesse W. Ridenour stood and had to stand while performing his work was directly beneath the place where said shaft entered said room or drift; that, on account of the great distance from the floor to the roof of said room or drift and on account of there not being any method of guiding said

cans while ascending in said drift or room, said cans, loaded with dirt, ore and rocks, were liable to swing back and forth on the end of said cable into said room or drift while ascending and before reaching said shaft at the place where said shaft entered said room or drift; that on account of said cans swinging back and forth, as above described, in said room or drift, said cans were liable to strike the sides of said shaft when they entered into it, jarring said cans and causing the boulders and pieces of rock and ore in said cans to fall down and onto the place where said Jesse W. Ridenour worked and onto said Jesse W. Ridenour; . . . that defendant carelessy and negligently failed to build or cause to be built a box or continuation of said shaft from the place where it entered into the said underground room or drift through the roof of said room or drift to or near to the floor of said drift, so that cans ascending from said room or drift would be guided by said box or continuation of said shaft and render said cans less liable to jar against the sides of said shaft and so that any rocks or boulders falling from said cans would fall straight down and not fall upon said Jesse W. Ridenour; that defendant negligently and carelessly failed to build or cause to be built a shed over the place where said Jesse W. Ridenour worked, so that any rocks and boulders falling from said cans would strike upon said shed and not strike said Jesse W. Ridenour. Plaintiff further states that on or about said second day of June, 1911, while said Jesse W. Ridenour was performing his duties as the servant and employee of the defendant in defendant's said mine, said Jesse W. Ridenour hooked one of said cans onto said cable and said can, loaded with dirt, rock and ore was hoisted upward on the end of said cable by means of said hoisting machine; that, on account of the dangerous and unsafe condition of said place, as above described, when said can entered into said shaft and as it was ascending in said shaft,

said can struck against the side of said shaft, jarring said can and causing a large piece of boulder or rock in said can to fall from said can; that on account of the dangerous and unsafe condition of said place, as above described, said large piece of boulder or rock fell down onto, upon and against the head of the said Jesse W. Ridenour, severely injuring him,'' and causing his death.

The answer was a general denial, coupled with the admission that Jesse W. Ridenour was employed as tub-hooker in defendant's mine and that it was his duty to hook cans as described in plaintiff's petition, and a plea that he assumed the risks of his employment.

The reply was a general denial.

This mine was being operated by means of a vertical shaft through which the ore and dirt and rocks were hoisted by a steam hoister and a steel cable. The shaft was some five feet square. The room or drift in which deceased was working at the time of the accident was bell-shaped, some one hundred and fifty feet square at the bottom, being about sixty-five to one hundred feet in height, that is, from the floor to the roof. A. L. Keller testified that the shaft was straight up and down; that this room where the ore was taken up and where deceased worked was some two hundred feet square, and that from the bottom of said room to the roof thereof was about ninety-five feet. The distance from the bottom of this room to the roof was variously estimated to be from sixty to one hundred feet. The evidence shows that there was nothing in this vacant place leading from where the shaft entered the roof of this room to the bottom to guide the cans or tubs of ore, dirt and rocks while they were passing from the bottom of the room or drift to the mouth of the shaft. . Mr. Keller stated that there was no continuation of the shaft through the open space, and not until the cans or tubs reached

the roof of the room or drift did they enter the shaft. The evidence of plaintiff tended to show that the tubs or cans that were hoisted bumped against the sides of the shaft as they were ascending; one witness testified that sometimes there would be as high as ten or twelve cans bump a day and then perhaps for two or three days they wouldn't hear a one bump; that every time a can bumped, something would fall out of it if it bumped hard enough. There was at the bottom of the mine, straight under the shaft, a platform. When the tubs or cans bumped, the falling rocks scattered over the bottom of the mine from twenty to thirty feet around this platform, falling all around in different places. On the morning of the accident the deceased was working at his duties as tub-hooker on the platform at the bottom of the shaft and had just started to step off the platform when the rock hit him. When the tub or can bumped on this occasion, some of the workmen cried "Run!" and the rocks fell all around the platform at the bottom of the mine. The tub or can had been loaded on the platform and a car had been rolled off the platform and the workmen were waiting for another car to be brought up when rocks commenced to fall around the bottom of the shaft. Witness Rutherford testified concerning the accident as follows: "Q. What first attracted your attention to this accident to Mr. Ridenour? A. Well, sir, I was standing right beyond the tub-hooker, Jesse W. Ridenour, and his brother was right opposite of me, and it looked to me as though he fell, started to run and fell. I heard the tub bump and he fell across the shaft from me. Q. You say you heard the tub bump? A. Yes, sir. Q. Did you see anything falling there? A. Yes, sir; boulders. Q. How many? A. Well, sir, I couldn't count them; all I saw at that particular time was three large ones rolling out towards where I was, out in that direction. Q. Where was he with reference to the place

where the tubs were hooked onto the cable? A. He was standing right at his post rolling an empty can; he hooked this can out and was rolling the empty back on the car in a stooping position.''

There was evidence on behalf of plaintiff that the common and ordinary method in use in that district to prevent injuries to men working in drifts or rooms of the character of the one in question was to lace or crib the shaft down, or to build a heavy snow-shed at the bottom; that ordinarily they are cribbed down to about the height of a man's head and that an opening is then left for the man to enter and hook or unhook the cans, so that as soon as he has done so he may step back out of the line of the shaft and be out of the way of falling objects. Where snow-sheds are used, they are constructed so that one end of it is in line just under one side of the shaft, so that a man in hooking and unhooking tubs can stand under the shed and perform his duties and be protected from falling objects. That where mines of this kind are being operated and there is a drift or room in which it is a long distance from the bottom of the room to the roof where the shaft enters the room, the usual or ordinary way of building or operating the mine so as to afford protection to persons who are working at the bottom of the shaft is either to lace the shaft down or crib it, or to build a heavy snow-shed at the bottom; that ordinarily they are cribbed or laced down to a reasonable depth—eight or ten or twelve feet above a man's head. In the mines where cribbing or lacing is impracticable, the usual practice is to construct a snow-shed by setting up four heavy posts and then putting heavy caps on top of them and covering with heavy lumber or logs; and the shed would be built just far enough over in the shaft so the cans would miss it a foot or two feet, to protect the workmen below from rocks that might fall out of the cans. That taking into consideration the expense of build-

ing a snow-shed and the fact of working in hard ground where dynamite is used to blast out the ore, it would be practicable to build a snow-shed near the place where the cans were being hooked onto the cable. Where the mining is in a large room, and where it is quite a distance from the bottom of the room where the men work to the roof where the shaft enters the room, the practice is to crib down the shaft or construct a snow-shed. That it is practicable and would be practicable in a mine in which there is a large room some two hundred feet square which is from seventy-five to one hundred feet in depth to crib down in the manner described.

The defendant's hoisterman testified in its behalf substantially as follows: That defendant had provided what is known as a center pull which would be a guide to the tub hooker in determining whether or not a can that was to be hoisted was in the center of the shaft when it started. That there is a place fixed at the bottom of the shaft where the cars run into the shaft—what is called the center pull—so that when a car gets in the center of the shaft the car wheels drop down in notches; that was measured and figured to be the center of the shaft. That he had had a great deal of experience as a hoisterman. He stated that but one other can had bumped in the shaft during the time he was hoisterman, from the time the mine started up in April to the time of the accident, and that this particular can that was carrying the rock which killed Jesse W. Ridenour bumped after it entered the mouth of the shaft, from ten to twenty feet above the line of entrance.

The State Mine Inspector for that district testified in behalf of defendant as follows: "Q. I will get you to state from your experience as a miner and examination of the mine, that it was practicable to place a continuation of the shaft by means of lacing or by means of cribbing from the point where it enter-

ed the top of the drift to the bottom in mines of this character? A. It wouldn't have been at that place at that time? Q. For what reason? A. The reason was, there was taking up a stope and shooting in that ground, would have shot any timbers or anything that would have been a continuation of that shaft down; they couldn't have held it in place at that time. Q. Now what was the character of that ground? A. That ground in the Chitwood district is of boulder formation. Q. What about the hardness of it, whether it requires very much powder or little? A. It would require a good deal of powder. Q. How much of a stope were they taking up at that time, do you remember? A. Six or eight feet; it might have been ten feet. Q. In regard to the distance away from the shaft where they were working, how far were they taking up this stope? A. As I remember, right on one side of the shaft they couldn't have been over thirty-five or forty feet, something like that, to the best of my recollection.''

The defendant's ground foreman testified that the shaft was started in April, 1911, and that deceased commenced work on the twenty-ninth of May following and was killed on the second of June thereafter. That he never knew of any cans bumping against the sides of the shaft prior to the one which caused this accident. That there had been hoisted out of the mine an average of three hundred to four hundred cans of ore and dirt daily, depending on the number of shovelers, and that the mine was worked six days a week, steadily. On cross-examination the witness was required to answer in regard to having been convicted for drunkenness and for keeping company with prostitutes and staying with them at night and going on their bonds in police court.

The defendant's bookkeeper testified that he kept a daily record of the cans of ore taken out of the mine and that between the eighteenth day of April and the

second day of June (1911), 8037 cans were taken through the shaft.

Frank B. Wilson testified for the defendant that he was the manager of defendant's mine and that no complaint was ever made to him in regard to cans bumping against the shaft, or anything of that character being wrong in the mine. That there was no reason in continuing the shaft down from the roof of the room to the floor and that it was not practicable to do so; that the ground was hard, with a substantial roof, and that it would not have been practicable from the way the mine was being operated at the time to have continued the shaft down to the ground or to have built a snow-shed for the protection of the operatives by reason of the danger of shooting it out in the operation of the mine.

Defendant further offered to prove by its bookkeeper that subsequent to the injury and up to the time the suit was instituted a large number of cans of ore had been hoisted from the mine below and that no accident had occurred, which evidence the court rejected.

Appellant contends that the petition is insufficient because it fails to state a cause of action, in this, that it does not allege that the failure to continue the shaft from the roof of the room or drift to the bottom was the cause of the can bumping, thereby causing the rock to fall and kill the respondent's father, but does allege that the failure to have such a guide by extending the shaft rendered the cans elevated through the shaft more liable to bump against its sides. This is a misapprehension of the full scope of the plaintiff's petition. The specific charge of the petition is that the defendant "carelessly and negligently failed to build or cause to be built a box or continuation of said shaft from the place where it entered into the said underground room or drift to or near to the floor of said drift, so that cans ascending

from said room or drift would be guided by said box
or continuation of said shaft and render said cans
less liable to jar against the sides of said shaft and so
that any rocks or boulders falling from said cans
would fall straight down and not fall upon said Jesse
W. Ridenour.'' The import of this language is un-
mistakable, and it not only alleged that the defend-
ant's failure to continue the shaft from the roof to
the floor of the room or drift was negligent, but alleged
that a continuation of the shaft from the roof to the
floor of the room would have rendered the loaded
cans less liable to jar, and in addition would have
caused any rocks or boulders that should fall from
the cans while being hoisted through the shaft to drop
straight down the shaft and not fall upon the deceased
where he was required to work. The further charge
in the petition was that a continuation of the shaft
should have been constructed by the defendant so as
to have prevented the ascending cans loaded with ore
and rock from swinging back and forth on the end
of the cable and thus have prevented the consequent
liability to strike against the sides of the shaft where
it entered the roof and precipitate its contents of
rock and ore on the workmen below on the floor of the
mine. The petition also alleged ''that, on account of
the dangerous and unsafe condition of said place, as
above described, when said can entered into said shaft
and as it was ascending in said shaft, said can struck
against the side of said shaft, jarring said can and
causing a large piece of boulder or rock in said can
to fall from said can; that on account of the danger-
ous and unsafe condition of said place, as above de-
scribed, said large piece of boulder or rock fell down
onto, upon and against the head of the said Jesse W.
Ridenour, severely injuring him,'' and causing his
death.

Appellant further contends that the respondent
failed to make out a case in that the evidence wholly

fails to show a causal connection between the alleged acts of negligence of the defendant and the injury and death of her father. In support of this contention the appellant points to the evidence as being practically uncontradicted that the mine had been cut out to a considerable extent below the ground, forming a room one hundred feet by two hundred feet, bell shaped; that the distance from the roof to the floor of the room was from seventy to one hundred feet; that there was no continuation of the shaft from the roof of the room to the floor, nor was there any snow-shed; and that the only acts of negligence charged in the petition and which respondent sought to sustain by her evidence were the negligent failure of the defendant to continue the shaft or erect the snow-shed. Also that the evidence tended to show that deceased at the immediate time of the injury was standing at his post of duty directly under the shaft and was struck by the falling rock. The appellant's reasoning is that the continuation of the shaft or the erection of the snow-shed would have been of no benefit whatever to the deceased and that his death would have resulted notwithstanding such constructions if he had stood in the shaft as the rock would have fallen down the shaft on him causing the injury, notwithstanding the extended shaft. But this reasoning fails to take into consideration important evidence in the record to the effect that without the continuation of the shaft not only was the ascending can loaded with ore and rock and dirt more likely to strike the sides of the shaft, but when it did in fact bump against the sides of the shaft, would empty a part of its contents, which in descending from the roof of the room was scattered broadcast over the floor of the mine ten or fifteen feet on either side of the platform immediately under the shaft; and the tub-hooker discharging his duties under these conditions was equally safe, so far as the evidence shows, whether he was immediately under the

opening in the shaft or ten or fifteen feet on either side of the opening. As there had been no place of shelter provided for him, it was impossible for him by changing his position to secure a place of refuge from the falling rock. The appellant contends that because the deceased under conditions then existing under which he was required to work, stood in the shaft, therefore, if his master had provided him a reasonably safe place of shelter, he would still have stood in the same place of danger directly under the shaft and received the same injury. We decline to enter into such a boundless field of conjecture. There is no rule of law or reason that requires us to believe that the tub-hooker at work at the bottom of this mine, if the shaft had been continued or a snow-shed had been erected so that by stepping a few feet to one side he would have been amply protected from falling debris, would not have availed himself of such protection when it was provided for him. Such a conclusion would require us to ignore the instinct of self-preservation and disposition of men to avoid personal harm.

Appellant also claims that material error was committed by the trial court in allowing improper hypothetical questions to be propounded to the plaintiff's expert witnesses Christman and Holderman; that these witnesses were allowed to give testimony for the purpose of showing what was practicable to be done at appellant's mine in the way of constructing a continuation of the shaft and a snow-shed which the plaintiff's petition alleged constituted defendant's negligence, and for the purpose of showing what was the usual and ordinary way of working mines in that mining region under conditions similar to those existing in appellant's mine. After the witnesses had qualified as experts, the record recites: "Q. I will ask you to state if you ever worked in any mines or have been in any mines and observed the

method of working that are mined by means of a vertical shaft through which the ore is hoisted and in cases where the shaft opened up into a drift or room which was very deep, say from fifty to one hundred feet deep? A. Yes, sir. Q. Where the shaft came into the roof? A. Yes, sir. Q. How many different mines of that kind have you worked in or known of and been in and observed, Mr. Christman? A. Half a dozen, I suppose. I can't just remember, but that many, I reckon. I never was in any I never worked in. Never had no business to be in them. Q. Where a mine of that kind is being operated and you have a drift or room which is a long distance from the bottom of the drift or room to the roof of it where the shaft comes into the room, what is the usual and ordinary way of building or operating the mine in the way of protection to the persons who are working at the bottom, if any? Mr. Bates: We object to that for the reason that it is not a proper question to ask of this witness because he hasn't shown that conditions in those mines are the same as the conditions in this mine."

In all occupations attended with great and unusual danger, the master must use all appliances readily obtainable which are known for the prevention of accidents, and the neglect to provide such readily obtainable appliances is proof of negligence.

The usual and ordinary way of constructing and operating machinery, structures and appliances is a proper subject of expert evidence. [Combs v. Rountree Construction Co., 205 Mo. 367, 104 S. W. 77; Obermeyer v. Logeman Chair Mfg. Co., 120 Mo. App. 59, 96 S. W. 673; Spencer v. Bruner, 126 Mo. App. 94, 103 S. W. 578.]

The question as to what facts may be submitted in the form of a hypothetical question to the judgment of an expert has been the subject of much controversy and diversity of judicial decision. In every case

the facts which the hypothetical question must cover should be governed largely by the subject-matter of each particular investigation and to a large extent subject to the sound discretion of the trial judge, but the rule in this state is an unbending one that the facts embraced in the hypothetical question put to the witness in every case must be within the confines of the evidence. [Benjamin v. Metropolitan St. Ry. Co., 50 Mo. App. 602; Russ v. Railway Co., 112 Mo. 45, 20 S. W. 472.]

It is the general rule in this state that objections to evidence to be available in the appellate court must be specific, and since no court can intelligently rule upon a question without understanding the question and the objection to it, it becomes the duty of counsel to make their objections specific and certain, and if they refuse to do so and the court overrules the objection to the offer of evidence, no error is committed by the trial court which will be available on appeal. The same rules are applied in making objections to hypothetical questions put to an expert; counsel must point out in what particular the question is objectionable, what facts are improperly grouped, and in what manner and for what reason they are misleading. To come within the rule, the objection to the hypothetical question should state why the question is not proper and what essentials are omitted. [Holton v. Cochran, 208 Mo. 314, 106 S. W. 1035; Orr v. Bradley, 126 Mo. App. 146, 152, 103 S. W. 1149.] In the case last cited, the objection to the hypothetical question was in these words: ''Defendant's counsel objected to the question as not a proper hypothetical question, omitting necessary essentials, and stating those that are not proven, incompetent, irrelevant and immaterial.'' The court in reviewing the sufficiency of the objection, said: ''The objection should have stated why the question was not proper, what necessary essentials

were omitted and what it stated which were not proven," citing O'Neill v. Kansas City, 178 Mo. 91, 100, 77 S. W. 64, and Roe v. Bank, 167 Mo. 422, 67 S. W. 303.

In this case the objection to the hypothetical question was based upon the assumption that the question did not show that the conditions in the mines concerning which the expert was called upon to testify were the same conditions which existed in the defendant's mine. This, it will be seen, was requiring identity of conditions, and if such a rule should be strictly applied it would be impossible in analogous cases to offer any expert evidence because no two mines are operated under precisely identical conditions.

In this case the hypothetical question propounded to the witness assumed only such facts as the plaintiff's evidence had already tended to establish and asked the opinion of the witness as to what was the usual and ordinary way of operating such a mine in the way of protection to persons working at the bottom, if any. We think the hypothetical question was not fatally defective in assuming facts which the plaintiff's evidence fairly tended to prove and in obtaining the expert's opinion as to what protection if any was generally afforded to operatives in mines constructed as this was. [Hicks v. Railway Co., 124 Mo. 115, 27 S. W. 542; Fullerton v. Fordyce, 144 Mo. 519, 44 S. W. 1053; Turney v. Baker, 103 Mo. App. 390, 77 S. W. 479.]

The objection that appellant makes to this hypothetical question in this court is that appellant's evidence showed that at the time of the accident the workmen in the mine were taking up a stope about twenty-five or thirty feet away from a point at the bottom of the shaft where the tub starts up the shaft and that the character of the ground that they were operating or blasting was very hard, and that the taking up of the stope and the hard ground which was being mined

were essential factors in determining whether it was practicable to continue the shaft downward or erect a snow-shed, and that these factors should have been embodied in the hypothetical question.

In this connection it may be noted that the expert witnesses for the defendant testified that it was not practicable to place a continuation of the shaft by means of lacing or cribbing from where it entered at the top of the drift to the bottom of the mine for the reason that they were taking up a stope and that shooting in that ground would have shot down any timbers or destroyed any erection on account of the blasting.

We find, however, that the plaintiff's expert witness was asked the following hypothetical question: "I will ask you to state if, in your observation and experience as a miner, whether or not the shaft could be extended down through an open room or drift in that way in such a manner. it wouldn't be affected by the blasting that was carried on in the mine? A. I have had that happen too, but where it interfered with that or broke any of that out we remodeled it and fixed it again and where it would be too much trouble we would build a heavy snow-shed, something a shock wouldn't knock down. Q. I will ask you to state if in your observation and experience as a miner, taking into consideration the expense and the fact that you are working in hard ground where it is necessary to break up the earth and ore, whether or not it is practicable to build a snow-shed of the kind you describe? State whether from your observation and experience as a miner, taking into consideration the expense of building a snow-shed and the fact that you are working in hard ground where you had to use dynamite to blast out the ore, to get the ore, whether or not it would be practicable to build a snow-shed near the place where the cans were being hooked onto the cable? A. I think it would; yes, sir." On cross-examination the witness testified: "Q. Don't

you know when they shoot in ground as hard as that it throws boulders fifty or sixty feet? A. Yes, sir; but they can turn those shots away from the shaft as well as toward the shaft.''

Under the facts disclosed, we are of the opinion that no material error was committed in overruling the objection and admitting the testimony.

Appellant contends that the judgment should be reversed on account of material error in allowing improper impeachment of its witness, B. F. Plumlee, on the ground that the credibility of a witness cannot be impeached by specific delinquencies but only by general reputation. In this case the plaintiff was allowed to prove, by way of impeachment, on cross-examination, that this witness had pleaded guilty to charges of drunkenness and had consorted with prostitutes. .

The rule was well stated by our Supreme Court in the case of State v. Long, 201 Mo. l. c. 675, 100 S. W. 587, as follows: ''The better doctrine would seem to be that, while such questions may be asked the witness on' cross-examination, it is a matter' largely within the discretion of the court before whom the case is to be tried. Had the witness in this case claimed his own exemption on the ground that his answer thereto might tend to incriminate him , unquestionably he should have been excused from answering it. He asked no exemption and properly answered the question, and the authorities cited show that it was not error to permit the question to be asked.'' In O'Connor v. St. Louis T. Co., 106 Mo. App. l. c. 220, 80 S. W. 304, the rule is thus stated: ''It is the law that on cross-examination the credibility of a witness may be affected, impaired or totally annihilated by showing from his own mouth his moral rottenness or total depravity, and for this purpose he may be asked on cross-examination, if he was ever in jail or state's prison and how much of his life had been passed therein.'' In Miller v. St. Louis Hospital Ass'n, 5

Mo. App. l. c. 401, the court approvingly quoted the following from Stephen's Dig. Law of Ev., 123: "When a witness is cross-examined, he may, in addition to the questions hereinbefore referred to, be asked any questions which tend to test his accuracy, veracity, or credibility, or to shake his credit by injuring his character. He may be compelled to answer any such question, however irrelevant it may be to the facts in issue, and however disgraceful the answer may be to himself, except," where the answer might expose him to a criminal charge.

The appellant further complains of the action of the trial court in refusing to admit evidence to show the frequency of the bumping of the cans or tubs after the accident under conditions similar to those that existed before the accident, for the purpose of showing the probability of accidents happening. The excluded evidence was that of George D. Carter who was the bookkeeper of the defendant corporation. He testified that he was the bookkeeper for the defendant at and subsequent to the time of the accident; that in the records kept by him was the daily report, the operating report, and everything done pertaining to the mine; that he kept a report of the cans that were hoisted and that the book which he had with him showed the daily and total numbers of cans hoisted. He was allowed to state the number hoisted prior to the accident. The question was then asked him what was the number of cans hoisted in that mine from June the second (the date of the accident) until October the thirty-first, which was objected to and the evidence was by the court excluded. It will be seen that there was no foundation laid for the introduction of this evidence such as that the entries proposed to be offered in evidence were made contemporaneous with the hoisting of the cans in such a way that they could be said to be a part of the *res gestae;* and further, that the bookkeeper himself did not pretend

that he had any actual knowledge of the facts as to which he was called upon to testify, but stated that the information from which the entries in his books were made up was communicated to him by some other person. It does not appear that it was the duty of any employee of defendant company to report to the bookkeeper the number of cans hoisted for entry on his books, or that any person having actual knowledge of the number of cans hoisted made the report to the bookkeeper. Where a clerk makes entries who has no knowledge of their correctness but makes them from items furnished by another, as where entries are made by a bookkeeper from reports made by a foreman, it is held essential that in addition to the oath of the party making the entry the party furnishing the items should testify to their correctness. [17 Cyc. 394.]

Appellant in the first instance filed in this court its brief which contained an "Assignment of Errors;" following this, and under a separate heading (Points and Authorities), is found stated the points relied on for reversal together with authorities cited under each point; and under another heading (Argument) the questions involved in the case are discussed. The respondent in due time filed a statement and brief. Thereupon the appellant filed its reply brief and argument, and later filed an additional reply brief and argument. The only attack made on the sufficiency of the instruction given for the plaintiff is found in the assignment of errors in the original brief of the appellant. The appellant, neither in its "Points and Authorities," nor in its "Argument," in such brief, made any reference to any alleged error in the giving of said instruction; nor does any reference to it appear in appellant's reply brief; *but in its additional reply brief and argument,* appellant states: "In addition to the points made in the reply brief of the appellant heretofore filed, appellant insists that the instruction

given at the instance of the plaintiff was error for the following reasons," and proceeds to enumerate them.

The rule of this court (Rule 18) is that all briefs "shall contain separate and apart from the argument or discussion of authorities, a statement, in numerical order, of the points relied on, together with a citation of authorities under each point. Any brief failing to comply with this rule may be disregarded by the court. The brief filed by appellant shall distinctly and separately allege the errors committed by the trial court, and no reference will be permitted at the argument to errors not thus specified, unless for good cause shown this court shall otherwise direct." This rule also requires that appellant shall serve the respondent with a copy of his brief thirty days before the day on which the cause is set for hearing, for the purpose of giving the respondent an opportunity to meet any questions presented by appellant for reversal of the judgment.

To permit the appellant *in an additional reply brief* to reopen the whole question as to errors committed by the trial court, not specifically pointed out or referred to in its previous briefs would be a great injustice to the respondent as it would require at his hands, in order to make an answer to the questions thus urged for the first time, the duty of publishing another brief, and often require of this court an extension of time for that purpose, and would lead to confusion and delay in appellate practice. "The respondent of course is only required to meet the questions urged by appellant." [Stid v. Railroad, 236 Mo. 382, 397, 139 S. W. 172.] An assignment of error, not insisted on in appellant's argument and brief, will be deemed waived. [Davis v. Barada-Ghio Real Estate Co., 163 Mo. App. 328, 143 S. W. 1108; Lange v. Railway, 115 Mo. App. 582, 91 S. W. 989; Corrigan v. Kansas City, 93 Mo. App. 173; Powell v. Palmer,

45 Mo. App. 236; Shaw v. Goldman, 183 Mo. 461, 81 S. W. 1223.] A party is not entitled to be heard on points suggested for the first time in his printed argument and brief in reply which points were not made in his original brief. [Lemser v. St. Joseph Furniture Mfg. Co., 70 Mo. App. 209; Kansas City ex rel. v. Walsh, 88 Mo. App. 271; Lucas v. Cella, 115 Mo. App. 395, 91 S. W. 996.]

It follows from what has been said that the judgment should be affirmed, and it is so ordered. All concur.

